# Roman *et al. v.* Woolfolk *et al.*

*Bill in Equity by Minority Shareholders against Corporation and its Officers to Protect the Interest of Minority Shareholders.*

1. *When suit by individual shareholders will not be entertained.*—A bill filed by a minority in number and value of the shareholders of a corporation against the corporation itself and its officers, will not be entertained unless it shows that application was first made by the complainants to the board of directors, or to the stockholders, to redress the wrongs complained of, or for authority to prosecute the suit in the name of the company, or sets out facts showing that it could not be done, or, that it was not reasonable to require it.

2. *Same; denial of application for receiver, and for injunction.*—When a bill is filed by individual shareholders without previous application to the directors or shareholders for redress of wrongs complained of, or good cause shown for not doing so, and application is made for an injunction, and the appointment of a receiver, the court will not consider whether the averments of the bill alone excuse this omission, but will consider also the sworn answers and affidavits introduced on the hearing.

APPEAL from Montgomery City Court.
Heard before the Hon. T. M. ARRINGTON.

BRICKELL, SEMPLE & GUNTER, for appellants.

1. The rule is that an answer which denies generally the facts charged in the bill, and at the same time admits facts which establish the charges, is taken as a plenary admission for the purpose of a decree.—*Doss v. Tyack,* 14 How. 313; Gres. Eq. Evidence, 459. An answer false in one particular loses all weight as evidence.—*Gunn v. Brantley,* 21 Ala. 633; *Pharis v. Leachman,* 20 Ala. 662.

2. When a corporation becomes insolvent, its assets are a trust fund for creditors in the first instance, and for stockholders afterwards, should anything be left for them.—*Corey v. Wadsworth,* 11 So. Rep. 350; 2 Mor. on Corp. § 787; 1 Beach. on Corp. § 113; Wait on Ins. Corp. § 145.

3. A corporation is insolvent when all its assets are assigned for debts, when it is sued for its debts, when it is doing no business, and has no corporate meetings.—*Corey v. Wadsworth, supra;* Cook on Stock & Stockholders, § 631; Wait on Ins. Corp. § 28; Gluck & Becker on Receivers, p. 37, §§ 14–16.

[Roman et al. v. Woolfolk et al.]

4. If the majority are corrupt and have committed frauds which they cannot be trusted to correct, it is the duty and right of the minority to have the trust administered through the aid of an officer of the court.—High on Receivers, 29½-3 and 364a; Beach. on Receivers, § 417; Wait on Ins. Corp. § 34; 2 Waterman on Corp. § 356-9; 2 Mor. on Corp. § 786; 103 Ill. 472; G. & B. on Receivers, § 16; 54 Ala. 622; 17 Fed. Rep. 48; 1 Mor. on Corp. §§ 281 and 543; 2 Beach on Corp. 772, 715; 2 Spelling on Corp. § 840.

5. The majority shareholders fraudulently assigned all the assets of the company by way of pledge, directly in the teeth of § 1664 of the Code, without consulting the stockholders or even the board of directors. They thereby abdicated their trust.—Consolidated T. L. v. Kansas City V. Co., 43 Fed. Rep. 205-6; Taylor on Corp. 778-9, 787-8.

6. The attempted ratification of Woolfolk's act by separate individual signatures of the directors, is of no significance. The stockholders alone could pledge or ratify the transfer of all the assets by way of pledge for an existing debt.—Ang. & Amer on Corp. § 291; 2 Mor. § 644; 45 Fed. Rep. 527; Cook on S. & S. § 652; 21 Pac. Rep. 373; 2 McCrary, 275; 91 Am. Dec. 607; 1 Spelling on Corp. § 426; 1 Mor. § 511.

ROQUEMORE, WHITE & DENT, and TOMPKINS & TROY, for appellees.—1. Although there is no appeal from the decree refusing to dismiss the bill for want of equity, yet the equity of the bill will be considered in determining whether a receiver should have been appointed or the injunction dissolved. 1. (On motion to dismiss the bill for want of equity.) Measuring the bill under the rule, on the motion to dismiss for want of equity, taking all the facts charged as true and well pleaded, when capable of being pleaded, has the bill equity? Its objects are: (a) the appointment of a receiver; (b) an accounting against trustees; (c) a dissolution of the corporation. The first object, the appointment of a receiver, as an independent matter, can give no equity to the bill. The remedy is an auxiliary and not an independent one. Spel. on Corp., 2 vol., sec. 851. The third object or purpose of the bill is clearly one of which equity will not take cognizance, except when presented in the manner provided by statute.

Sec. 1683 et seq. of the Code provides the manner in which corporations in this State can be dissolved by proceedings in chancery. This method is exclusive.—Spel. on Corp.,

2 vol., § 1008; *Adams Cot. Mill Co. v. Dimmick*, 11 So. Rep. No. 15, 428.

It is admitted by complainant's counsel that this bill is not filed under our statutes, so the second object or purpose of the bill is the only one that can be relied upon to give it equity.

Equity has jurisdiction of all matters of trust; but, before the *cestui que trust* can maintain an action where the right is in the trustee, reason must be given why the suit was not brought by the trustee; and in actions by stockholders to enforce corporate rights, it must be shown that the directors had been requested to sue, and had refused; or facts shown which would be sufficient reason for not making the request. This is a condition precedent.—*M. & C. R. R. Co. v. Woods*, 88 Ala. 630; *Mack v. DeBd. C. & I. Co.*, 90 Ala. 400; *Nathan v. Tompkins*, 82 Ala. 437.

The mere allegation of the pleader that certain members of the board were under Woolfolk's influence and control, can not be taken as a fact. Without the averment that the request had been made or allegations of fact, from which the law would conclude that such a request would have been futile, the bill is fatally deficient on a motion to dismiss for want of equity.—*Mack v. DeBd. C. & I. Co.*, *supra;* *Woods v. M. & C. R. R.*, *supra*.

2. (On the merits of the bill for the appointment of a receiver). The receiver should not be appointed if the needed protection can be given by other less harsh remedies. *Foster v. Brierfield I. Co.*, 54 Ala. 623; 2 Spell. Corp., § 852.

The acts charged as being wrongful, and the one which is averred as a reason for the appointment of a receiver, is, at most, either acts of mismanagement or breaches of trust. Infidelity or mismanagement of some, or even all of the officers of a corporation, affords no grounds for the dissolution of the corporation, or taking its management from its officers and placing the same in the hands of a receiver.—2 Spell. on Corp., § 852; The French-Bank cases, 53 Cal. 495; *Neal v. Hill*, 16 Cal. 145; *Howel v. Denel*, 43 Barbour, 504; *Bellmont v. Erie R. R.*, 52 Bar. 637; *Waterberry v. U. & E. Co.*, 50 Bar. 137. These cases are full and conclusive on this point.

Every wrong complained of, measured in the light of the evidence bearing upon it, is not only an act of infidelity and mismanagement, at most, but is one that can be protected against, or relieved from, by other remedies which would work less damage and hardship. If so, a receiver should not be appointed.—2 Spell. on Corp., § 852, and authorities cited in note 1.

The magnitude of the interest involved should be passed upon by the court in considering the remedy.—2 Spell. on Corp., § 855.

HEAD, J.—This bill is filed by S. Roman and six others, who are a minority in number and value of the shareholders of the Alabama Terminal and Improvement Company, a body corporate, against J. W. Woolfolk, W. E. Woolfolk, George B. Shellhorn, S. B. Stern, A. C. Saportas, F. W. Hoadley, Chas. Henderson, the Farley National Bank, L. B. Farley, J. L. Hall, the Montgomery, Tuscaloosa and Memphis Railroad Company, a body corporate, and the said Alabama Terminal and Improvement Company, hereinafter styled the Terminal Co. The interests of the Terminal Company are sought to be protected by the suit. On account of alleged grievances hereinafter referred to, the bill prays for the appointment of a receiver of its assets, for an accounting by defendants and a dissolution and final winding up and settlement of the affairs of the corporation. Two of the complainants, viz.: S. Roman and A. St. C. Tennille, and six of the respondents, viz.; J. W. Woolfolk, W. E. Woolfolk, S. B. Stern, Chas. Henderson, George B. Shellhorn and A. C. Saportas, constitute the board of directors of that company. J..W. Woolfolk is, and has been since the organization, president and general manager. J. B. Knox, one of the complainants, is secretary. The connection with the case of the Farley National Bank (with whom, in interest, are said L. B. Farley and J. L. Hall), and the Montgomery, Tuscaloosa and Memphis Railroad Company, will be shown hereafter. The Terminal Co. was organized in 1887, under the general laws of this State then in force, and among its charter powers is the power to build and equip railroads. In fact, the moving purpose of its organization was to build the Alabama Midland Railroad, under contract with the Alabama Midland Railroad Company, organized for the construction of a railroad from Montgomery, Alabama, to Bainbridge, Ga., a distance of 175 miles. It secured the contract for the building and equipment of that road, and was to receive, and did receive for the work the mortgage bonds of the Midland Company at the rate of $15,000 per mile, and all the capital stock, except the stock subscribed for by cash subscribers; also all other subscriptions to capital stock obtained or to be obtained, and all its property—real, personal and mixed; except rights of way and certain other excepted properties. The Terminal Company then sublet the construction of the road to J. M. Brown & Co., railroad builders, who completed

and delivered it in May, 1890. When the Terminal Company was organized it received from a large number of persons, subscribers to its capital stock, their notes for their subscriptions, amounting in the aggregate to about $300,000. The complainants are among these subscribers, and their notes are yet unpaid. These subscription notes and the assets and properties received from the Midland Company, as the consideration of the construction of the Midland road, constituted, in the main, the assets of the Terminal Company, with which it was enabled to engage the services of Brown & Co. to build the road. These assets had to be utilized to that end. It seems from the history given by this record that from the beginning, the enterprise was almost entirely confided to the direction, control and management of J. W. Woolfolk, the president and general manager. The directors resided in different States, and there appears to have been difficulty in securing meetings of that body; so that the financial policies and plans of operation were left very largely to be designed and executed by Woolfolk, without much aid from them, and there seems to have been a general disposition on the part of directors and shareholders to acquiesce in and ratify whatever he did while the Midland road was being constructed. It is unnecessary to state in detail the various transactions had by Mr. Woolfolk in New York by which funds were realized upon the Terminal Company's holdings. To state generally, he floated the Midland bonds by guaranteeing the payment of the interest for a certain number of years, securing the guarantee by pledge of the subscription notes and other assets, which were deposited by the Metropolitan Trust Co. of New York; and afterwards, in 1890, sold to the Plant Investment Company, in New York, the Terminal's stock, &c., and other property in the Midland road and in a belt line street road in Montgomery, for $500,000, and in the transaction secured release from the guarantee of interest on the Midland bonds, and return of the securities held by the Metropolitan Trust Co., the subscription notes, then unpaid and so returned amounting to about $265,000. These transactions were all authorized or ratified by the company and there seems to have been no real complaint of Woolfolk's management in reference to them, except that after the authorization of the sale to the Plant Investment Co. some of the complainants who had voted in its favor afterwards objected and sought to prevent the sale, which action caused another meeting of the stockholders which again authorized the sale. In fact, the allegation of the bill is that on the completion of the

Midland road great success in the Terminal's enterprise was developed, leaving the company in possession of large assets representing actual profits realized. About the time of the sale to the Plant Investment Company, Woolfolk rendered a statement to the Terminal Company of its assets and liabilities showing estimated assets $1,544,705.92 and liabilities $847,263.72. It is shown, however, by Woolfolk, that these estimated values suffered enormous decline in the general commercial depression, affecting peculiarly enterprises of this character, which followed the failure of Baring Bros. in the fall of 1890—Woolfolk placing the decline at over $400,000. He gives a detailed statement by which he reaches that result.

In November, 1887, Woolfolk procured to be organized a railway company known as the Alabama Great Northwestern Railway Co., for the purpose of building a road from Montgomery to Tuscaloosa and on to a point on the Alabama and Mississippi line in Lamar county, Ala. Woolfolk's transactions in connection with this latter company form the principal subject-matter of complainants' complaint. The scheme of this organization, devised by Mr. Woolfolk, evidently was to establish a connection with the Mobile & Ohio Railroad, or the Illinois Central, at some point in Mississippi, to penetrate the coal fields of Alabama, and supply a missing link between the Alabama Midland, then under his construction, and terminal facilities to the northwest, and that it was believed the road when constructed would be very valuable and early disposed of to advantage to some of its connecting lines. Upon organization, the capital stock of this company was placed at 50,000. The subscribers were W. F. Joseph 5 shares, E. B. Joseph 5 shares, R. P. Tallman 50 shares, J. W. Woolfolk 200 shares, Jas. S. Negley 150 shares, P. C. Smith 5 shares, W. G. Hutcheson 20 shares and M. E. Pratt 5 shares. These persons, except Negley, were elected directors; W. F. Joseph was elected president, J. W. Woolfolk vice-president and general manager, and W. G. Hutcheson sec'y and treasurer. In April, 1889, the name of the company was changed to Montgomery, Tuscaloosa and Memphis Railway, and at an election under the new organization held in July, 1889, the two Josephs, Pratt and Woolfolk and W. S Chisholm and Morris Jessup were elected directors, W. F. Joseph, president, J. W. Woolfolk, vice-president and general manager, J. C. Woolfolk, secy. and treas., and W. C. Giles, ass't sec'y. On Oct. 16, 1889, Jessup resigned as a director, and C. C. Munroe was elected in his stead; and on the same day Woolfolk resigned as

vice-president and said Munroe was elected in his stead, on Oct. 24th. On Nov. 11th, 1889, W. F. Joseph resigned as president and J. W. Woolfolk was elected. He continued in office until Nov. 12, 1889, when he resigned both as president and director. W. F. Northington was elected a director in his stead. Pratt and Chisholm having died, I. B. Newcombe and W. W. Van Voorhis were elected to succeed them on Dec. 19th, 1890, and at an election held that day, C. C. Munroe was elected president, J. B. Newcombe 1st vice-president and E. B. Joseph 2nd vice-president. The bill charges, on information and belief, in reference to this organization, that Woolfolk and his brother W. E. Woolfolk, Shellhorn, Saportas, F. W. Hoadley, Chester C. Munroe or some of them, and others unknown, formed some agreement or entered into some combination for the purpose of building a railroad called the Montgomery, Tuscaloosa and Memphis Railroad, extending from Montgomery northwest to Tuscaloosa, thence northwest in the direction of Memphis, and organized a corporation to own and operate said railroad, which company was and still is under the control of the above named parties and other associates and confederates acting with them and in their interest. That these parties, under some understanding and arrangement unknown to complainants, entered upon the construction of said railroad and had, prior to the 20th day of July, 1890, expended a large amount of money and contracted heavy obligations in the undertaking, and, at that time, finding themselves cramped for means and seeing that their contract and undertaking would be ruinous to them, formed a combination and conspiracy, some or all of them, with other associates unknown to complainants, to use the controlling influence which they held in the terminal company by their ownership of a majority of its stock, which they then held and now hold, and by having a majority in number of the board of directors in their interest, to induce the Terminal Company to buy out their contract, and to assume all their obligations, amounting to $494,330.77 or more, and to undertake the construction of said Montgomery, Tuscaloosa and Memphis Railroad. And accordingly, on the 20th July, 1890, Woolfolk in furtherance of the scheme, at a meeting of the stockholders of the Terminal Company, proposed and passed by the votes of himself and associates interested in said contract, a resolution reciting that a proposition had been made to the Terminal Company to build said road and authorizing and directing the board of directors to enter into negotiations with said M., T. & M. Railway Company,

15–98.

with power to act if satisfactory terms could be made. That at a meeting of the board held thereafter, on Nov, 12th, 1890, said Munroe, as president of the M., T. & M. Company, submitted a written proposition to sell out the contract for building said road to the Terminal Company for $100,000, if the Terminal would assume the debts amounting to $494,330.77 and engage to complete the road. A committee of three directors was appointed to investigate and report on this proposition, and on Nov. 24, 1890, the committee reported adversely, showing in their report that the enterprise was dangerous and likely to be ruinous, and their report was unanimously adopted. Woolfolk was then present at the meeting. On the adoption of the report, a motion was adopted instructing Woolfolk, as president, to convert the assets of the Terminal Company into cash and pay its debts, and he was also directed to call a meeting of the stockholders to take action looking to the liquidation and dissolution of the Terminal Company. That on the 20th Dec., 1890, the meeting of stockholders, as directed to be called, was held, and the previous proceedings of the directors, meeting were read, and thereupon the secretary read another written proposition of said Munroe, as president of the M., T. & M. Company, offering to sell out to the Terminal Company without any bonus, if the Terminal Company would assume all liabilities of his company ; and thereupon Woolfolk introduced and had passed by a vote of stock, including his own, a resolution instructing the directors of the Terminal Company "to open negotiations and close the contract with the owners of said enterprise known as Montgomery, Tuscaloosa and Memphis Railway Company, aforesaid, represented by Chester C. Munroe, president of said company, with power to act, to build, complete and equip said railroad, and do such other things in reference thereto as may be lawfully done under the charter of this company," meaning 'the Terminal Company. The said resolution was passed by an affirmative vote of 2241-2 shares against the negative vote of 642.33-100 shares, and complainants charge that the stock voting in the affirmative, or the great majority thereof, was controlled and voted by persons directly interested in the M., T. & M. Company, and that the stockholders present at the meeting, and not interested in said enterprise, voted in the negative, and that a large number of them entered a protest on the minutes against the resolution, giving notice that they would not be bound by said vote. It will be observed that this charge does not name the persons who voted in the affirmative, or state how or in what manner they were in-

terested in the M., T. & M. Railway Company, except the name of J. W. Woolfolk, and it does not state how many shares he held, nor how he induced others to vote for the proposition. The bill further charges that the board of directors of the Terminal never took any further action in reference to the purchase of the contract for building said road, or in any manner complied with said resolution; nor was it afterwards discussed in any meeting of the board. But, the bill alleges, the said Woolfolk and his associates in the enterprise, and others confederating with them, unknown to complainants, and without the knowledge of complainants, appropriated and used all the available assets of the Terminal Company, amounting in value to $500,000, or other large sum for their own use, or the use and benefit of the other owners of the said enterprise represented by Chester C. Munroe, as president, without any authority or right whatever derived from the board of directors of the Terminal Company; that among the assets so used are all the said stock notes which had been deposited with the Metropolitan Trust Company amounting to $600,000, or other large sum, among which are the stock notes of complainants; that a large amount of said stock notes, with other securities of the Terminal Company, has been transferred, upon some agreement unknown to complainants, to, and are now held by, the Farley National Bank, located at Montgomery, Ala., of which said J. L. Hall is president, or held by said J. L. Hall and L. B. Farley; that some of said notes have been surrendered to the makers thereof by Woolfolk, by and through transactions amounting to donations to such stockholders of their liability on their notes. The character of these transactions is not stated, nor with whom had, nor the amount of the notes so disposed of, except that it is alleged that Woolfolk had in his hands large amounts of the Alabama Midland bonds, belonging to the Terminal Company, which he sold to said parties, friends of his, liable on said stock notes, at their value in the market, and surrendered the stock notes of the purchasers as parts of the transaction, and the complainants are unable to state the number and amount of such transactions, but they aver, on information, that notes of a large amount have thus been used and disposed of by Woolfolk in fraud of the rights of the Terminal Company. The bill charges that all the acts and doings of Woolfolk and his associates in reference to the funds and assets of the Terminal Company, under and by which it is averred they have used, appropriated or misapplied everything belonging to the Terminal Company available for use and conversion, are

illegal, void and fraudulent; and they, with all others receiving said assets, with knowledge of their ownership and misappropriation, including the Farley National Bank, J. L. Hall, L. B. Farley and the M., T. & M. Ry. Co., are liable and responsible to the Terminal Company for the funds so misapplied, which, are averred, to amount in the aggregate to $500,000, or other large sum, in value. The bill further charges that since the misapplication of such funds, Woolfolk has attempted to have the same ratified, so far as the transactions with the Farley National Bank are concerned, by the directors of the Terminal Company, and for that purpose prepared and sent round to the individual members of the board (not assembled and acting as a board, but separately, as individuals) two resolutions, copies of which signed by J. W. Woolfolk, A. C. Saportas, W. E. Woolfolk, Chas. Henderson and Geo. B. Shellhorn, dated January 26th, 1892, and February 7th, 1892, respectively, are appended to the bill; which documents, in terms, ratify and confirm the transfer of said securities to said bank. They were never considered by the board as such, but the directors whose names are signed thereto signed the same, as alleged by the bill, at the solicitation and request of Woolfolk, and it is charged that Woolfolk and "some others signing said resolutions" (what others are not stated) were and are directly interested in the said enterprise represented by C. C. Munroe, as president, and were and are interested, directly or indirectly, in the said use and misappropriation of the funds and assets of the Terminal Company, and so complainants aver that the said resolutions, if they had been passed at a regular meeting of the directors of the Terminal Company by and through the votes of said parties signing them, would be void, and that they are void for the further reason that they have never had the sanction of the directors assembled as a board. It is further alleged that "J. W. Woolfolk and his brother W. E. Woolfolk, A. C. Saportas, and others of said parties acting with said J. W. Woolfolk and interested with him in misappropriating the assets of said Terminal Company, control a majority of the directors of said Terminal Company and also of the capital stock of the corporation, and can not, for that reason, be relied on to bring any suit for the recovery of the said assets so misapplied and misappropriated. And orators aver that unless the said assets can be recovered the said Terminal Company is wholly insolvent, and that if it is held to the engagements entered into in behalf of said company by said J. W. Woolfolk without the authority of said Terminal Company re-

lating to the construction of said M., T. & M. Railroad it will be and is "insolvent in any event."

An amendment to the bill was afterwards filed, alleging that Woolfolk had contracted, in the name of the Terminal Company, debts to the amount of several hundred thousand dollars, amongst them a debt of $150,000 to the Farley National Bank, without the authority of the board of directors and largely for the use of Woolfolk and his associates, or for the building and construction of said M., T. &. M. Railroad —an enterprise in which the Terminal Company has no interest; that a suit at law is now pending on the debt of Farley National Bank; that said Shellhorn, an associate and confederate of said Woolfolk, and under his influence, and who acted with him in creating said debt and otherwise disposing of the assets of the Terminal Company, without authority and for improper purposes, accepted service of the writ in said suit, and said suit will not be defended by said Woolfolk and Shellhorn, nor will it be defended in the name of said Company, since a majority of the directory consisting of J. W. Woolfolk, A. C. Saportas, W. E. Woolfolk and Chas. Henderson are all interested with, or under the influence of said J. W. Woolfolk, and can not be relied on to defend said suit; that W. E. Woolfolk is a brother of said J. W. Woolfolk, and with said Shellhorn, receives employment by or through said J. W. Woolfolk, as president of said Terminal Company; that said J. W. Woolfolk gave to each of them a small amount of the stock to qualify them to serve as directors; that otherwise they have no interest in said company, and are mere "figure heads" to do the bidding of said J. W. Woolfolk; that said Saportas is also under the influence of said J. W. Woolfolk and has been privy to, and engaged with him, in the misappropriation of the funds and assets of the Terminal Company, and is willing to do anything asked by Woolfolk in the way of ratification of his illegal actings and doings concerning said Terminal Company; that said Henderson is in combination with said Woolfolk, and all of the said parties are interested adversely to the said Terminal Company. It is alleged on information and belief that said Henderson has received from said Woolfolk assets of the Terminal Company to a large amount, without any consideration sufficient or proper in law being paid therefor, and said Woolfolk has undertaken to release and discharge said Henderson from large obligations to the company for the stock therein, in an irregular and improper manner, and without the authority of the Terminal Company; and that said Henderson, influenced by these matters,

[Roman et al. v. Woolfolk et al.]

is subject to the manipulation of said Woolfolk in all matters of the Terminal Company. Sundry acts of misappropriation alleged in the original bill are reiterated in this amendment, viz., the transfer of assets to the Farley National Bank and the use of assets of the company in discharge of obligations of the M., T. & M. Railway Company; and it is alleged that these latter appropriations were made without taking any security for the re-payment of the money so expended, and without even the form of a contract in reference thereto. It is further alleged that Woolfolk had called a meeting of the directors for Aug. 10th, (the day of filing the amended bill); that Saportas had come from New York, at his bidding, to be present and serve his purposes, and that Shellhorn, W. E. Woolfolk and Chas. Henderson were on hand for the same purpose; and these, with said J. W. Woolfolk constitute a majority of the board of directors. That the object and purpose of this meeting was to ratify the acts of Woolfolk, Saportas and Shellhorn and others in the said use of the assets of the Terminal Company, and in the creation of the said debt to the Farley National Bank, and the transfer of assets to secure the same, and to ratify other illegal and fraudulent acts of Woolfolk and associates. It is further alleged that there has been no meeting of the directory of the Terminal Company for more than a year, and the company is engaged in no business, that Woolfolk failed to carry out the resolution of the board of directors requiring him to convert the assets into cash and pay the debts, but instead of doing so, has, with his associates, converted the assets to other unlawful uses, as herein stated, and that no steps will be taken by them to collect the large debts arising by reason of said misappropriation. In Sept., 1892, a further lengthy amendment was filed, alleging the insolvency of Woolfolk and the M., T. & M. Railway Company; that the subscribers to the capital stock of the latter company were merely nominal, and only a nominal part of their subscriptions had been paid in; that the company had no means and was a railroad merely on paper; that it had no means of raising money, except that raised upon the negotiation of its bonds as the work upon the railroad justified, and that the road is still incomplete and its stock worthless, and its bonds not worth twenty-five cents on the dollar; that Woolfolk organized the said company while president of the Terminal Company, which latter had good credit, and large means in his hands, as president, and that the scheme was practically the personal scheme and property of Woolfolk; that Woolfolk and certain unknown associates, took

the contract to build and equip said M., T. & M. Railroad
for the stock thereof, at a given rate per mile; and the aver-
ments of his use of the Terminal assets in the construction
of that road are repeated, charging him with buying equip-
ments for that road and the Midland road jointly, using the
credit of the Terminal Company for both, and mingling the
accounts and business of the two roads. He is charged
with taking money from the assets of the Terminal Com-
pany for his own use, and charging same to the M., T. & M.
Railway Company, upon a pretended sale to the latter com-
pany of stock issued to him in the Terminal Company; and
the charge of buying in the stock of favored stockholders
of the Terminal with the bonds of that company, to the
amount of some $100,000 or more, is repeated; and it is
charged generally that all accounts which Woolfolk has
kept since the organization of the Terminal Company are
fraudulent, and that they have never been audited by any
one competent to protect the interest of the company. It
is further alleged that Woolfolk was personally interested
with J. M. Brown & Co. in the contract for building the
Midland road, whereby Brown & Co. have been paid large
sums of money in excess of what they were justly entitled
to; and that he discharged competent engineers on the Mid-
land road and replaced them with others who could be and
were imposed upon by the contractors, or who allowed and
passed, knowingly, improper items and charges for construc-
tion. It is charged that Woolfolk issued to said Brown &
Co. $50,000, or more, of the Terminal stock, which has
never been paid in, and for which they still owe, which
stock is voted, used and controlled by Woolfolk and Brown
& Co., in furtherance of his schemes. That Woolfolk issued
to Hoadley & Co. of New York, of which firm said Chester
C. Munroe is a member, $50,000 or more of said stock, for
which they owe, and that this is also used by Woolfolk, and
in his interest, whenever occasion demands; that Munroe
and Hoadley & Co. have been actively operating with Wool-
folk in all his schemes against the Terminal Company, and
participating with him in the profits derived therefrom;
that he had Munroe elected president of the M., T. & M. Co.,
when he was not a stockholder therein, for the purpose of
having him make the proposition to sell out the M., T. & M.
road to the Terminal Company, and that the stock of Hoad-
ley & Co. and J. M. Brown & Co. in the Terminal, was con-
trolled and voted in favor of accepting that proposition in
the interest of Woolfolk. It is charged also that Woolfolk
issued to Saportas $45,000, or more, Terminal stock, for

which he still owes ; that Saportas is a confederate of Wool-
folk in his schemes for defrauding the company, and par-
ticipates in the profits of such frauds, and his stock is also
used by Woolfolk or in his interest.   It is alleged that the
stock held by Woolfolk and these other persons, as well as
other stock bought up with the means of the Terminal Com-
pany, amounting to some $100,000, give him absolute con-
trol of the stock of the company at any stockholder's meet-
ing.   It is also charged that Woolfolk has undertaken to
release solvent subscriptions to the stock of the Terminal
Company, to the amount of $20,000 or more, substituting
therefor his own obligations, or of other insolvent persons;
that he has control of the M., T. & M. R'y Co. by virtue of
his ownership of substantially all the stock therein, as well
as control of a majority of the stock, and of the directory of
the Terminal.   It is alleged that the Terminal Company is
out of business, and is now insolvent, and generally that the
interests of the company can not and will not be protected
under the management of Woolfolk and his associates.

The original bill incorporates many minute and searching
interrogatories to the defendants calling for discovery upon
oath, of the facts touching all its material allegations.
Woolfolk answered, at great length, giving, upon oath, in
minute detail, his version of every act of maladministration
charged against him, and a substantial history, from his
standpoint, of the Terminal Company, the M., T. & M. Co.,
and his connection with, and acts of administration in, each,
from their organization down.   The other defendants also
answered.   Woolfolk sets forth his financial operations in
the building of the Midland road, a general outline of
which we have already given, and shows, in detail, what
assets remained, on the completion of that road, substanti-
ally, except as to value, as charged in the bill.   He ex-
plains fully the organization of the M., T. & M. Ry. Co. by
himself and others, and denies emphatically that any of
the persons connected with or interested in that company,
except himself and the two Josephs, ever had any interest
whatever in, or connection with, the Terminal Company ; he
denies, with emphasis, each and every charge contained
in the bill of combination and conspiracy between him-
self and others to promote that enterprise, or to subserve
purposes of his own, or otherwise, and he alleges that the
persons charged to be in combination with him had and
have no interests whatever to be subserved except
their interests as stockholders and directors in the Ter-
minal Company, and that he had and exercised no influence

or control whatever over them, except such as resulted from their confidence in his judgment and capacity to manage the affairs of the Terminal Company to its best advantage, and he denies that, in any of the transactions assailed, they or either of them ever did an act, under his influence, for the purpose of furthering his personal interests, or any other interests but those of the Terminal Company; he alleges that they are business men of high standing in the commercial world, and incapable of lending themselves to the purposes and ends charged against them. It is unnecessary to extend this statement giving at length the form of these denials. They go specifically and fully to each and every charge of combination and fraud, and categorically answer and repel every imputation cast upon him and the other directors and shareholders charged to be in collusion with him, and explain, in detail, each and every transaction assailed by the bill as fraudulent, in a way, which, if true, is consistent with good faith and an honest purpose to serve the interests of the Terminal Company. In his history of the construction of the Midland road, he shows that to enable the Terminal Company to pay the interest guaranteed by it on the Alabama Midland bonds, and upon which it would have defaulted in May, 1890, but for this loan, he as president of the Montgomery, Tuscaloosa and Memphis Railway Co., from Nov. 20, 1889, to July 3, 1890, loaned the Terminal Company, of money belonging to the M., T. & M. Ry. Co., the sum of $417,461.80 of which, during the same period, the Terminal Company paid back $249,514.81, leaving a balance due July 3, 1890, of $167,946.99; that at the time of his resignation as president of the M., T. & M. Co. on Nov. 12, 1890, the Terminal Company had discharged its indebtedness to the M., T. & M. Co., and that Company then owed the Terminal $97,767.77. He admits the making of the proposition by Munroe as president of the M., T. & M. Co. on Nov. 1890, to the board of directors of the Terminal Co., and the action of the board thereon as alleged in the bill, as well as the resolution of the board instructing him to convert the assets into cash and pay the debts and to call a meeting of the stockholders to take action looking to the liquidation of the corporation and states that he did not carry out the resolution to convert the assets and pay the debts, because of the action of the stockholders meeting, called in pursuance of the resolution, by which the modified proposition of Munroe, as shown by the bill, was accepted by the stockholders and the Terminal directors instructed to close the contract

with the M., T. & M. Company. He admits that there was no formal action of the board, in meeting assembled, closing the contract, in pursuance of said proposition and instructions, but that he and a majority of the board, with the knowledge and acquiescence of all the directors, did carry out said instructions and accepted the proposition in the terms in which it was proposed, and thereupon entered upon the completion of the road; and it is shown by affidavit of Shellhorn, that immediately thereafter the company had letter heads printed for use in the Terminal office, with which all its correspondence was thereafter conducted, some of which correspondence was with some of the complainants, on which were printed in large type the words, "The Alabama Terminal and Improvement Company. (Builders and Owners of) The Montgomery, Tuscaloosa and Memphis Railway, and former owners of "The Alabama Midland Railway;" and on Feb'y 23rd, 1891, at a meeting of the Terminal directors, at which complainants Roman and A. St. C. Tennille were present, a resolution, seconded by Roman, was passed reciting that the Montgomery, Tuscaloosa & Memphis Railway Co. was largely indebted to the Terminal Company, and authorizing the President Woolfolk to join the M., T. & M. Co. in executing bond to the State of Alabama to enable the latter company to obtain from the State a grant of $10,000 made by the State to it from the two and three per cent. fund. The answer of Woolfolk, admits that the stockholders' meeting of Dec. 20th, 1890, by a vote of 2,241½ against 642⅓ shares, accepted the said proposition of Munroe and ordered the directors to close the contract, and denies that any one, besides himself, voted on the proposition who had any stock or any interest whatever in the M., T. & M. Co. and alleges that his stock in that Company amounted to the sum of $67,800 or only 687 shares, and he denies very emphatically that he had or exercised any influence or control whatever over the votes cast by any stockholder; and he insists that the acceptance of the proposition and the undertaking of himself and other directors in taking charge of and constructing the M., T. & M. road was in strict accord with the judgment and wishes of the majority of the Terminal stockholders and directors having in view the welfare and success only of the Terminal Company. He admits, that acting under this authority he expended up to April 1, 1892, of the Terminal monies and acceptances $207,364.98 upon the M., T. & M. Railroad property, and alleges that the Terminal Company holds against this advance $368,000 of the M., T. & M.

Co. bonds, and will own about three fourths of all its stock of both issues, preferred and common, say $1,725,000, when the road is completed, at which time he believes the property would command a large sum of money. He admits that he contracted a debt of about $150,000 with the Farley National Bank, a large part of which was to raise funds for the construction of the M., T. & M. road and the balance for use in the construction of the Midland road, and that he transferred to the bank as collateral security large assets redeemed from the Metropolitan Trust Co. He alleges that he had authority to make this transfer as president under the by-laws of the company, and by established usage in his administration of the Terminal affairs, having done so many hundred times before in similar transactions; and he states and insists that in January 1892, six of the eight directors, with full knowledge of all the facts, expressly ratified and confirmed said transfer by signing a resolution to that effect, a copy of which he appends to his answer. He admits that afterwards one of the directors, S. B. Stern, gave notice of the withdrawal of his ratification of said transfer. He states that this form of ratification of his acts had often been adopted by the directors when they could not be conveniently assembled, they being residents of Troy and Montgomery, Ala., Columbus, Ga., and New York City; and at the time of this ratification, in January, 1892, two of them were in New York, one in Columbus, Ga., one in Troy and three in Montgomery, and no meeting could have been conveniently assembled. He gives previous instances of such form of ratification in which some of the complainants joined as directors, one of which was the ratification of the sale to the Plant Investment Co., in August, 1891, and another the transfer in January, 1892, of notes amounting to $16,000 to Hoadley & Co., as collateral security. He shows also that all his financial transactions in connection with the M., T. & M. Co. were duly and regularly entered upon the books of the Terminal Company as they occurred, and he produces many exhibits from the books showing, in detail, these and other transactions assailed by the bill; and he states no steps were taken by complainants to prevent any of these transactions or disaffirm the same until the filing of this bill on May 31, 1892. He states also that the creditors of the Terminal Company, as well as the large majority of the stockholders and directors, approve his policy in reference to the M., T. & M. Road, and are disposed to assist his efforts and uphold him in his work; and he shows that he

is a personal endorser of the Terminal Company's obligations to the amount of $196,323.64, and personally liable for the same. The condition of the M., T. & M. Co. on November 1, 1890, is stated to have been: assets, $1,178,330.14, including the outlay to that date, and liabilities $494,330.77; and on April 1, 1892—the date of the last statement made —assets $1 385,566.65, of which amount $989,566.65 had been expended upon the work, and bonds then held by the Company in value $396,000, and liabilities, exclusive of the amount invested in the work of the Terminal Company, $416,104.14, the expenditures of the Terminal Company being $286,886.31, and that these statements are based upon fair valuations. He states that the road has been graded to Tuscaloosa, within 5 per cent. of the whole, and that the Company has steel rails delivered on its right of way enough to lay seventy miles of track, said steel costing $260,000; besides 200 cars and a complete bridge for the Alabama river now ready for shipment and erection, besides other valuable assets; and he further states that negotiations for the complete rehabilitation of the Company's finances are nearly completed; that Mr. Saportas is now in London to close negotiations for the sale of the bonds to responsible capitalists, and that if let alone, the work of completing the road to a connection with the systems in Mississippi will soon be resumed and carried to speedy completion, when all interests of the Terminal Company will be fully protected. As we have said, all other particular charges of fraud and collusion are denied or explained, circumstantially and in detail, and it is deemed unnecessary to set forth the denials at length. The answer of Woolfolk was sworn to and considered as his affidavit on the hearing of the application for a receiver, and the motion to dissolve the injunction. The defendants Saportas, Shellhorn, Henderson and W. E. Woolfolk, filed separate answers (the last three being under oath) fully denying all charges against them, and explaining in detail the transactions with which they were connected. These sworn answers were also considered as the affidavits of the parties on the hearing. Separate affidavits of J. L. Hall, L. B. Farley and G. B. Shellhorn were read by respondents corroborative in some respects of Woolfolk; and affidavits of J. B. Knox, W. F. Joseph, E. B. Joseph, Stern, Roman and Lorenzo Semple, corroborative of some of the allegations of the bill, were read by complainants. The chancellor overruled the motion to dismiss the bill for want of equity, but granted the

[Roman et al. v. Woolfolk et al.]

motion to dissolve the injunction and refused the application for a receiver. Complainants appeal.

HEAD, J.—As the case is presented to us we can not properly pass upon the equity of the bill, except as incidental to the motion to dissolve the injunction and the application for a receiver. The bill fails to show that application was made by the complainants to the board of directors or to the stockholders to take steps for the redress of the wrongs complained of, or for authority to prosecute the suit in the name of the company, but the facts charged are relied upon as showing that such an application would have been fruitless. It is not denied that the policy of the law is to leave the affairs of corporate bodies to the management and control of their own chosen agencies, and that a minority of stockholders will not be permitted to displace corporate authority and control, by substituting therefor the policy, management and control of the courts, except in plain cases of such fraud or maladministration as works manifest oppression or wrong to them; and that before calling upon the court to take into its hands the administration of the corporate affairs, it must be made clearly to appear, not only that such oppression or wrong to them depends, but that every reasonable effort has been made to secure redress and prevention of further mischief within the company itself. These requirements are the most salutary, and of the highest importance. We had occasion to speak on this subject in *Merchants & Planters' Line v. Waganer*, 71 Ala. 581. We there said, "In government of corporations much must be left to the judgment and discretion of the directory, and much must be credited to the fallibility of human judgment. If it be supposed an unwise course is being pursued, or that the interests of the corporation are suffering, or likely to suffer, through the inefficiency or faithlessness of an official, an appeal should first be made to the directory or governing body to redress the grievance. Failing there, in ordinary cases, the next redress will be found in the power of the ballot, which usually comes into exercise at short intervals." "We quoted approvingly the cases of *Greaves v. Gonge*, 69 N. Y. 154, and *Brewer v. Boston Theatre*, 104 Mass. 378. In *Hawes v. Oakland*, 104 U. S. 450, Justice Miller, in delivering the opinion of the court, stated that a stockholder could appeal to the courts for relief, where the board of directors, or a majority of them, are acting for their own interest in a manner destructive of the corporation itself, or of the rights of the other shareholders."

"That is precisely what is averred in this case." "But," Justice Miller adds, "In addition to the existence of grievances which call for this kind of relief, it is equally important that before the shareholder is permitted in his own name to institute and conduct a litigation which usually belongs to the corporation, he should show to the satisfaction of the court that he had exhausted all the means within his reach, to obtain, within the corporation itself, the redress of his grievances, or action in conformity to his wishes. He must make an earnest, not a simulated effort, with the managing body of the corporation to induce remedial action on their part, and this must be made apparent to the court. If time permits, or has permitted, he must show, if he fails with the directors, that he has made an honest effort to obtain action by the stockholders as a body, in the matter of which he complains; and he must show a case, if this is not done, where it could not be done, or it was not reasonable to require it." Continuing, we said: "These principles commend themselves to our approval by the strongest of considerations. A corporation, to attain the highest success, should, like a family, dwell together in unity. And when disputes arise between members of this body corporate, or law created household, they should, if possible, be adjusted among themselves. It should be a strong case to justify a resort to personal litigation, which almost invariably leads to personal alienation, if not open hostility." See, also, *Mack v. DeBardeleben Coal & Iron Co.*. 90 Ala. 396. We are not to consider, as the case is now presented to us, whether the averments of the bill taken as true make a case excusing effort on the part of complainants to seek relief in and through the company itself or not. The chancellor, in effect, held them sufficient when he refused the motion to dismiss the bill for want of equity, and it is not our purpose now to review that ruling as it is not necessarily before us. The case comes before us, in the matter of the receivership and injunction, not only upon the averments of the bill but upon the sworn answers and affidavits introduced upon the hearing, as well. Upon a careful consideration of the whole case, it is quite clear to our minds that no sufficient reason is made to appear why appeal should not have been made to the company itself to redress the alleged grievances, or for authority to use its name in the prosecution of the suit.

It is shown without doubt that not a member of the board of directors except Woolfolk, and not a stockholder, except him and the two Josephs, have any interest whatever in the Montgomery, Tuscaloosa and Memphis Railway Co., adverse

[Highland Avenue and Belt R. R. Co. v. Dusenberry.]

to the interests of the Terminal Company, and the charges in the bill of influence and control over them for unlawful purposes, on the part of Woolfolk, are as emphatically and fully denied as they are alleged; and there is no sufficient corroborative evidence in support of the allegations of the bill upon this subject, to justify the extremity of wresting from the hands of the corporation, where the law places them, all its assets, and restraining it from performing the functions of its creation. Upon the case now made, we are bound to hold that complainants should have presented their grievances, in a proper way, to the company, and invoked proper remedial action at its hands; and having failed to do so, they are not in a position to ask relief of the court. The bill has been retained by the chancellor, and issues made up on the pleadings. What the aspects of the case will be when the proofs are regularly taken upon those issues, if the bill is further prosecuted, we of course can not know. We rest our conclusion upon the case as it is now presented to us. The decree of the chancellor dissolving the injunction and refusing to appoint a receiver is affirmed.

Affirmed.