# Bridgeport Development Co. v. Tritsch.

*Bill in Equity for the Appointment of a Receiver of a Corporation.*

1. *Right of a stockholder to file a bill to redress corporate wrongs; what must be shown.*—Before a stockholder can maintain a suit in his own name against a corporation of which he is a member, to have redressed alleged corporate wrongs, there must be a previous request by him of the directors or governing body of the corporation to remedy and redress the grievances complained of; but when it is made to appear by the averments of the bill, that if such a request had been made, it would have been futile and ineffective, because the litigation looking to remedying the evils complained of would have been under the direction and control of those who were themselves the wrong-doers, said bill can be maintained upon averments of the facts constituting such excuse for not having made a previous request.

2. *Same; same; when receiver properly appointed.*—On a bill filed by the stockholders of a corporation for the appointment of a receiver of the assets of the company and for an accounting, it appeared that the corporation was organized for the purpose of buying and selling real estate, to erect buildings and sell or rent the same, to transact a general real estate business, and to have, enjoy and exercise the powers conferred upon such corporations by the general law of the State; that the majority of the directors of said corporation had been such officers from the organization of the company or during the time in which the transactions complained of occurred; that the company was projected and organized by officers and others who controlled an improvement company, which owned a large tract of land in a certain city; and that for the purpose of benefitting such officers and stockholders in the improvement company by the purchase of said land, the complainant's company purchased from the said improvement company, 1,200 lots for which it paid in cash $170,000 (which was all the capital paid in money), and stock at its par value amounting to $115,000, which price greatly exceeded the real value of the land, and the payment therefor left the complainant's company without any available assets; that in point of government, the two companies were practically one, the majority of the officers of each being practically the same; that during the three years covered by the transactions involved no account was rendered of business done by the complainant's company; that a number of the lots were allowed to be sold

[Bridgeport Development Co. v. Tritsch.]

for the original purchase price, which was owed by the improvement company at the time of this sale to the development company; that the complainant's company was involved to a large extent by unlawfully becoming surety on the other company's paper; that this same real estate was allowed to be sold for taxes and to remain unredeemed; that judgments were suffered by default, to which valid defenses could have been made; that the books were improperly kept, and the funds of the corporation misappropriated: that the company was hopelessly insolvent, and had been to all practical intents and purposes abandoned by its officers and directors; that it would be futile and ineffectual to request or demand the directors to redress the wrongs complained of, and that if this present action, or any other one to remedy the grievances, was prosecuted by such officers, such litigation would be under the direction and control of those who are themselves the wrong-doers. *Held:* That the averments of the bill showed that the complainant was entitled to maintain the bill without averring that he had made a request of the governing body of the corporation for relief and for redress of the wrongs complained of, and that a receiver was properly appointed.

APPEAL from the Chancery Court of Jackson.

Heard before the Hon. THOMAS COBBS.

The facts of the case are sufficiently stated in the opinion.

GEORGE N. MESSITER, JESSE E. BROWN and WILLIAM L. MARTIN, for appellant.—Upon the averments of the bill, the complainant was not entitled to the appointment of a receiver.—*Strickland v. Gay*, 104 Ala. 375; *Etowah Min. Co. v. Wills Valley Min. Co.*, 106 Ala. 492; *Williams v. Dismukes*, 106 Ala. 402; *Fort Payne Fur. Co. v. Fort Payne C. & I. Co.*, 96 Ala. 472.

ALEX T. LONDON and JOHN LONDON, *contra.*—1. If a corporation is insolvent and its directors have been guilty of a fraudulent mismanagement of its affairs, and it has ceased to prosecute the business for which it was incorporated, this of itself presents a fit case for a receiver.

In High on Injunctions, section 292, the learned author says : "If, however, the corporation is insolvent and its directors have been guilty of a fraudulent mismanagement of its affairs and it has ceased to transact the business for which it was incorporated, its financial embarrassments being such as to render it impracticable for it

to resume, a fit case is presented for a receiver in order to preserve the property of the corporation for the benefit of its creditors and stockholders."—Wait on Insolvent Corporations, § 183; *Coal & Mining Co. v. Edwards*, 103 Ill. 472.

In Beach on Receivers, section 417, this learned author says : "It becomes the imperative duty of the court to make the appointment in cases where the officers, after the insolvency of the company, have improperly and fraudulently disposed of its property."—*Nichols v. Perry Patent Arms Co.*, 11 N. J. Eq. 126.

2. "Where the directors or officers of a corporation are mismanaging the business and jeopardizing the rights of the stockholders, the court will appoint a receiver upon the application of a stockholder."—20 Amer. & Eng. Encyc. of Law, 272; Beach on Receivers, §§ 405, 417.

3. A corporation has no power to endorse accommodation paper, and the National Park Bank is chargeable with notice.—4 Amer. & Eng. Encyc. of Law, 226, 227; *Ala. Gold Life Ins. Co. v. Cent. A. & M. Asso.*, 54 Ala. 73 ; *Chambers v. Falkner*, 65 Ala. 448 ; *Tod v. Kentucky Land Co.*, 57 Fed. Rep. 47.

HEAD, J.—Bill in equity by Leo Tritsch, a shareholder of the Bridgeport Development Company, against that company and its officers and directors, and the National Park Bank, for the appointment of a receiver of the assets of the company, an accounting from other defendants for assets misappropriated, to enjoin the enforcement of a large judgment obtained by the National Park Bank against the company and for general relief. The appeal is by the defendants from the order of the chancellor affirming the appointment of a receiver made by the register.

The Bridgeport Development Company is a body corporate organized, under the general laws of Alabama in October, 1891, to buy and sell real estate ; erect buildings, and sell or rent the same, and to have, enjoy and exercise the powers conferred upon such corporations by Chap. 2, Title 1, Part 2 of the Code of Alabama. The by-laws of the company provide that its business shall be to purchase, hold and possess real estate and buildings in the city of Bridgeport, Ala., and to sell at pub-

lic or private sale, lease, mortgage or exchange, improve and restrict the same, to make builders' loans thereon, and to subscribe and own stock in any other company or enterprise that may be located in the city of Bridgeport, Ala. The authorized capital stock was $300,-000, divided into 3,000 shares of $100 each of which $285,000 was issued, the balance remaining in the treasury. Complainant owns forty shares for which he paid par. The bill avers, that to induce complainant to purchase these shares, the defendant corporation represented to him that it was the owner of a large tract of land in Bridgeport, in fee simple, free from incumbrances, and of great and increasing value, upon which it had made large improvements, and had contracted with the Bridgeport Land & Improvement Company by which the latter was to spend, and was then engaged in spending, $150,000, in improvements on the land, under the direction of the defendant company's officers. The directors of the company when the bill was filed, elected November 8, 1893, were Frederick Aldhouse, Richard A. Cunningham and J. Van Vechten Olcott, resident citizens of New York, and Oscar W. Whitcher and Russell C. Johnson, resident citizens of said city of Bridgeport, Ala. The officers were said Frederick Aldhouse, President; R. A. Cunningham, vice-president, and O. W. Whitcher, Secretary and Treasurer. It is averred that all these directors and officers are parties, to a greater or less extent, in the commission of the various offenses and misconducts in the bill charged, and that if this action was prosecuted by them, or through them, or by counsel of their selection, they would be practically suing themselves, and the innocent stockholders would be entirely without remedy; that the company is still under the control of the very directors and persons by whom the very schemes and wrong-doings referred to, and complained of, were committed, and that it would be futile and ineffective to request or demand from them, the commencement of this action, or any action which may be necessary to redress such wrongs, or protect the rights and interests of complainant and the other innocent shareholders, and the property and assets of the company. It is averred that the company is now wholly insolvent; that all of its real estate was suffered to be sold for taxes for the year

1892, to-wit, $373.79, on the 31st day of July, 1893 ; that the unpaid taxes due September, 8, 1894, upon said real estate, together with the cost of redemption amounts to the sum of $1,434.96; and in addition to this there are unpaid city taxes which on September, 1st, 1894, amounted to $255.10. It is next averred that a judgment has been obtained against the company, for about $180, for office rent in Bridgeport, by the said O. W. Whitcher, director, secretary and treasurer of the company, under which the company's property is advertised to be sold on October 1, 1894, That on August 15, 1893, a judgment was recovered by the said National Park Bank of New York against the company, in the court of common pleas for the city and county of New York, for the sum of $14,764.90. The bank brought suit on this judgment against the company, in the city court of Bridgeport, in this State, and, on or about July 12, 1894, obtained judgment therein for $15,844.50 ; that execution issued upon this judgment to the sheriff of Jackson county who advertised thereunder all the real estate and personal property of the company for sale on August 27th, 1894. This sale was postponed until October 1, 1894, and complainant avers that he applied to the attorney of the National Park Bank for a further postponement, which has been refused ; and. he avers, that in order to obtain the first postponement the bank was paid $1,000, on or about August 23, 1894, of which complainant contributed out of his own funds the sum of $250, for the purpose of saving the property of the company. It is averred that the only other assets of the company of which any trace can be found in the books, consists of alleged promissory notes to the amount of about $8,250, which the company received as part payment for lots sold by it, and which the makers refuse to pay because of alleged breaches of contract by the company, and false representations made by the company to induce them to become purchasers. That about September 6, 1894, complainant made a personal examination of the company's safe in its office in Bridgeport, and said notes were not in the safe, and that said J. Van Vechten Olcott, a director as aforesaid, informed complainant that the notes were being carried around by the president of the company, and were in his personal possession, without any memorandum of any kind

being left in the office. That there are no other assets
of the company, and, as complainant believes, the com-
pany was unable to pay its debts as far back as Decem-
ber 9th, 1892. It is averred the company ceased to do
business about June, 1892, which fact complainant did
not ascertain until about September, 1894; that the
company has been, to all practical intents and purposes,
abandoned by its officers and directors, and that the last
entry in the minute book, is of the minutes of the meet-
ing of the company held on November 15, 1893; that
such minutes follow the minutes of an alleged annual
meeting held in Bridgeport November 8, 1893; that the
by-laws require that ten days notice of meetings of
stockholders shall be given by the secretary, and the
object of a special meeting shall be stated in the notice;
that complainant has never received any notice of any
of the meetings, except in November, 1893; that said
Olcott asked him for a proxy of his stock, which he
gave, and he has been wholly kept in the dark as to the
actings and doings of the company and its officers and
agents, and did not discover the fraudulent conduct, in
the bill complained of, until September, 1894. The bill
repeats that the company has become hopelessly insol-
vent and unable to carry on its business, and that it be-
came, and for at least two years last past has been, the
duty of the directors, trustees and managers to wind up
its affairs and prevent further loss; but they have failed
to take any steps looking to a winding up thereof, as a
part of the wrongful, unlawful and fraudulent scheme
and conspiracy to prevent their misdeeds coming to
light and to prevent their being called to justice and
account for the same; and to enable the property of the
company to be slaughtered and purchased by themselves,
or in their interest, to the exclusion of the stockholders.
The bill avers that the judgment recovered by the
National Park Bank was not for the debt of the com-
pany, or for one which the company could have lawfully
incurred; that the promissory note for $10,000, on the
company's alleged indorsement of which the recovery
was had, was indorsed by the company solely for the
accommodation of the Bridgeport Land & Improvement
Company, through certain of defendant company's
officers, never thereunto authorized, and by said Olcott,
individually; that although Olcott was also an indorser

of said note, and although two separate suits were begun on the note simultaneously in the said court of common pleas of New York, the one against the defendant company and the other against the Bridgeport Land & Improvement Company, and judgments entered on the same date in both actions, the said Olcott was not made a party defendant to either of said actions; and complainant avers, on information and belief, that these facts were known to said National Park Bank. The bill charges that the same persons who control the defendant company control the Bridgeport Land & Improvement Company, that the summons and complaint in the action against the defendant company, was served upon said Frederick Aldhouse, president of defendant company in the city of New York; and in the action against the Bridgeport Land & Improvement Company was served upon J. Van Vechten Olcott, the president of the last named, and a director of the defendant, company; and in both actions judgments were suffered to be entered by default. The complainant avers that the commencement of said action was unknown to him, and was carefully concealed from the stockholders of the defendant company, and no opprotunity was given any of the stockholders to defend the action or to take steps for the appointment of a receiver of the company; all of which, it is averred, was done with the evident fra udulent and unlawful intent to enable certain of the stockholders and officers of the company, by suffering such a default, to escape personal liabilities upon their indorsements and other liabilities upon said promissory notes. That all the bank books of the company have disappeared, except the stubs in the check-book showing an account between the company and the First National Bank of Bridgeport; that said stubs disclose that large amounts of the funds of the defendant corporation were withdrawn therefrom illegally for champagne,, cigars, and for trips to different parts of the country; that no trace of any of the check-books, bank-books or vouchers of the account, alleged to have been kept by the company with the National Park Bank of New York, can be found in the office of the company at Bridgeport; that the sources of complainant's information as to the existence of such an account are the statements made to him by said Frederick Aldhouse, presi-

dent of the company. A copy of the stubs from the check-book of the Bridgeport bank is made an exhibit to the bill, showing large sums paid out for a horse and phaeton, wines, liquors cigars, expenses of entertainments, and travelling expenses, details of which, and other checks drawn can be seen by referring to exhibit No. 8, p. 30 of abstract. That it appears from the minutes of stockholder's meeting held in New York, at office of said Olcott, on August 18, 1893, three days after the entry of judgment in favor of National Park Bank, that the only business transacted was, "On motion, the secretary was authorized and instructed to execute a bill of sale of the horse, wagon and harness belonging to the company, now at Bridgeport, to secure the payment of the unpaid salary due the assistant secretary." Said Aldhouse and Olcott on whom said processes were served, in the suits of the National Park Bank, were present at the meeting. That it appears from the books of the company that the money of the company, instead of being used to pay its debts and carry on its business, was loaned to certain of the company's officers, towit, Cunningham and Aldhouse, to the Bridgeport Lumber Company, in which said Cunningham and Olcott were largely interested, and of which a brother-in-law of said Cunningham was president. Such loans were, as they so appear, December 11, 1891, $2,000, and December 15, $1,000, and April the 6, 1892, $1,500, to the said Lumber Company; and money so appeared to have been loaned the secretary, towit, February 22, 1892, two loans, one of $675, and the other of $603. It is averred that the following named persons subscribed for stock of the defendant company, as follows : Henry Morgenthan, 200 shares ; Charles Weinberg, 40 shares ; Frederick Aldhouse, 40 shares, and R. A. Cunningham, 40 shares ; and that at a directors' meeting held October 30, 1891, which was one day after the company was chartered, at which there were present, according to the minute book, directors Cunningham, Aldhouse and Morgenthan only, they being personally interested in the subject matter of the resolution, it was resolved that "Messrs. H. Morgenthan, J. C. Morgenthan, R. A. Cunningham, F. Aldhouse and C. Weinberg were given three months option to either consider their subsciptions

paid in, as payments in full, or as first payment on the proportionate amount of stock." "Minutes of the meeting of the directors held at the office of the company at Bridgeport, present, Messrs. Aldhouse, R. A. Cunningham, J. C. Morgenthan. Also, the Finance Committee of the L. & I. Co., Messrs. Olcott, Meyer, H. Morgenthan, Jones and Messiter. Moved, seconded and carried, that the balance of the subscriptions of the stock due from Messrs. Aldhouse, Powell and Kilpatrick, be cancelled, and stock issued to these parties to the amount that they paid for. J. C. Morgenthan, Secretary." That the minute book shows that at a stockhoders' meeting on November 8, 1893, a motion was made by Mr. Kilpatrick, who was the general manager of the Bridgeport Land and Improvement Company, from whom the defendant company purchased the lands which formed its main assets, that the directors be empowered to sell, mortgage or otherwise dispose of the property of the company as would seem to be for the best interest of the stockholders; which motion was adopted. The bill avers that the books show that specified numbers of shares of stock were subscribed for by O. W. Whitcher and J. W. Hudson, respectively, and much less numbers of shares were issued to, or paid for by them; that H. H. Longstreet, W. K. Peyton, George Hann and S. H. Chisholm each appear as subscribers for 40 shares, and there is no record of the issue of any stock to them, nor of the receipt of any money from them. On November 24, 1891, J. C. Morgenthan, then secretary of defendant company, wrote Dunn's Commercial Agency purporting to give a statement of the condition of the company, in which the statement is made that the authorized capital of $300,000, had all been subscribed, and $98,000, paid in; and the bill avers that on January 23, 1892, the same person wrote to the treasurer of the company to inquire, "what success you have had in placing shares of D. Co., stock"—D. Co. meaning the defendant company. This letter is made an exhibit, but appears to be without date. The bill repeats that $15,000 of the stock remains unsubscribed for; and avers further, that the books of the company do not show the payment, up to November 24, 1891, of $98,000, as stated in the first named letter. It is further averred, that during the months of April and May, 1894, about 150 lots of the

company were sold to R. A. McFarland and A. J., I. S. and R. L. Hembree, and J. B. Herron, upon judgment against the Bridgeport L. & I. Co. That upon the books of the company there appear large numbers of entries which have been altered, stricken out, accounts not closed up, the balance sheets not entered in the ledger, and the financial reports have never been sent to the stockholders; and it is averred that unless relief sought by the bill is granted, the company will continue to be mismanaged, as before set forth, and its resources squandered and misapplied, and its properties sacrificed and wholly lost, and all the rights and interest of the stockholders irretrievably destroyed and annihilated.

The complainant afterwards amended his bill, and alleged that the defendant company was projected and organized by the officers and directors of said Bridgeport Land and Improvement Company for the purpose of selling a part of its real estate in Bridgeport, and on November 3, 1891, the defendant company by said Aldhouse, its vice-president, entered into a contract with the improvement Company, through said Olcott, its president, for the purchase of 900 additional lots in Bridgport, 300 lots having been theretofore sold to defendant company, for which the defendant company agreed to pay $225,000, and the selling company undertook to convey said lots to defendant company by proper warranty deed, upon payment of the purchase money as stipulated in a written agreement exhibited with the amended bill, at the time of which agreement, it was well known to said Olcott and Aldhouse and the other officers and directors of both said companies, that said Improvement Company, the vendor, had no title to about 200 of said lots, but that the same were subject to a lien for the purchase money due to the person or persons from whom the said Improvement Company had bought the same, and that that company had no power to convey the same, but they, in disregard of their obligation to the stockholders, subsequently accepted a deed from the Improvement Company and undertook and agreed to pay it the full contract price for said lots. That after the acceptance of said deed, the defendant company issued to said Improvement Company paid up stock to the amount of $119,000, in payment for said 200 lots at $250 apiece, and of a balance due for the other lots sold to defendant

company ; and the bill insists that defendant company had no lawful authority to issue stock for said lots, and that said stock so issued is, therefore, wholly unpaid for, and that the owners and holders thereof are now indebted to defendant company for the full par value of said stock. That after the issue of said stock the holders of the purchase money liens on said 200 lots against their vendee, the Improvement Company, enforced their lien in chancery, and all of said 200 lots have been sold, under decrees, for sums insufficient to pay the amounts due thereon by the Improvement Company, so that defendant company had and received nothing whatever of value for the stock it issued in payment for said lots. That some of the officers and directors of the Improvement Company who made the sale of said lots, and received the stock, aforesaid, were the directors and managers of both corporations, and well knew of said infirmity of title. Complainant avers he is informed and believes that of said stock, so issued, said Olcott is the present owner and holder of 640 shares ; M. L. and C. Earnest, 275 shares ; Max Weil, 255 shares, and Emma Cohn 40 shares, all being residents of New York, and they are made parties defendant to the bill. That complainant has been informed by said Whitcher and Olcott, directors of defendant company, and by many others that said Cunningham and Henry Morgenthan were prominently and actively interested in both said companies and their organization and incorporation ; and as a part of the scheme of organizing the defendant company and floating the stock thereof, it was agreed between the Improvement Company and said Cunningham and Henry Morgenthan, that the Improvement Company would convey to them, Cunningham and Morgenthan, about 150 lots in Bridgeport as compensation .to them as promoters of the defendant corporation ; and it is averred, upon information and belief, that in pursuance of this agreement the said Improvement Company, on January 23, 1892, executed and delivered to said parties, a deed conveying to them 150 lots ; which deed is made to them as trustees, but no trust is declared in it, or any other recorded instrument which complainant or his counsel has been able to discover after thorough search of the records of Jackson county, wherein the lots lie. That the deed is recorded in Jackson county and the bill insists that, by

law, the title to said 150 lots is held by the grantees in trust for the defendant company, and said Henry Morgenthan is made a party defendant to the bill, and it is prayed that he and said Cunningham be decreed to convey the said lots to defendant company. It is further averred that said promissory note for $10,000, on which said National Park Bank obtained judgment against defendant company, as aforesaid, was given for money borrowed from said bank to purchase or pay for the furniture in a hotel in Bridgeport which was owned by said Improvement Company; and defendant company never had any interest therein; yet some of the officers and directors of the defendant company, being also officers and directors of the Improvement Company, or largely interested therein, made and delivered said note of defendant company to said bank, upon which said bank, well knowing it was given for moneys advanced and paid to said Improvement Company, sued defendant company thereon, and by collusion with the other defendants, obtained said judgment, under which it is now threatening to sell the entire property of the defendant company. Complainant further avers that, by the books of the defendant company, on November 19, 1892, a check was drawn by the defendant company on the Madison Square Bank, of New York, in which it had funds to the order of Lochman, Morgenthan & Goldsmidt for the sum of $1,318.10, for which complainant could find no voucher in the office of defendant company, and has been unable to learn from any of the officers of the company why said sum was given or paid to said firm. The bill also shows that a check for $500. was drawn by the treasurer in favor of said Aldhouse, on said Madison Square Bank, April 4, 1893, but no voucher therefor is on file in the office, nor does it anywhere appear for what said payment was made; and that on September 12, 1892, a check for $400, on the said Bridgeport bank, was drawn by one of the officers payable to George Messiter, then a stockholder in the company, and since November 9, 1892, a director and secretary thereof, and also at all said times a director and officer of said Improvement Company, which complainant is informed and believes was given to said Messiter to pay for some entertainment given by said Improvement Company; and on December 19, 1892, another check on the same

bank for $225 was given to said Messiter; and on April 26, 1893, still another for $100, for all which money there are no vouchers or receipts in the office; that much of the money on deposit in First National Bank of Bridgeport, has been from time to time drawn out by the officers of the defendant corporation, on checks payable to bearer, and there are no vouchers or receipts in the office explaining for what purpose said moneys are drawn or used, nor has complainant been able to get any information in reference thereto from any of the officers; that in the checks drawn on the Madison Square Bank by the treasurer five different colors of check were used, all of which books were missing, and of return checks or vouchers eight were missing, the stubs of which showed they aggregated $47,489.63, and among the return vouchers was a slip as follows: ''$15,036.54, March 16, 1893. Charge R. A. Cunningham, Treas. for return of (3) vouchers with account current rendered October 28th, 1892;'' yet there are no vouchers or receipts in the office showing how these sums had been applied.

We have thus condensed the phraseology of the bill, and set forth the several grievances complained of as causes for the appointment of a receiver, in order that they may appear as concisely as practicable, and their bearing upon the question of the appointment of a receiver made plain. It will be remembered that this appeal involves nothing but the question of the propriety of the appointment of a receiver. The complainant must, therefore, show by his bill not only some equitable ground of relief, but that a receivership is necessary in furtherance of that relief. Although the bill may contain equity, yet if the relief sought may be as well obtained without disturbing the possession of the property involved, it is most clear a receiver will not be allowed. Again, in *Roman v. Woolfolk*, 98 Ala. 219, we stated some principles which govern the appointment of receivers. We need not repeat what we there said, except to say, that a minority of stockholders will not be permitted to displace corporate authority and control, by substituting therefor the policy, management and control of the courts, except in plain cases of such fraud or maladministration as works manifest oppression or wrong to them, and, we will add, when the displacement of corporate control plainly appears to be neces-

sary to prevent further mischief; and, further, that before calling upon the court to take into its hands the administration of the corporate affairs, it must be made clearly to appear not only that such oppression or wrong to them depends, but that every reasonable effort has been made to secure redress and prevention of further mischief within the company itself. We say every *reasonable* effort. If it clearly appears that application to the governing body would be a futile and fruitless performance, and it is impracticable to obtain action by the stockholders, then effort, on that. line, will not be required.—*Etowah Mining Co. v. Wills Valley M. & M. Co.*, 106 Ala. 492. The complainant has sued without making any such effort, upon the theory that his case comes within the exception stated. Let us see if the position can be sustained. The directors elected in October, 1891, were Myers, Gunter, Cunningham, Morgenthau and Aldhouse. They continued in office until November 8, 1893, when Aldhouse, Cunningham, Olcott, Whitcher and Johnson were elected and constituted the board of directors, and they were in office when the bill was filed. Thus we see, that of those who served from October 28, 1891, to November 8, 1893, only Aldhouse and Cunningham were continued in office after November 8, 1893, and up to the time the bill was filed.

Upon examination of the allegations of the bill, all of which we have herein substantially set forth, it will be seen that not a grievance is charged which did not occur long prior to the election of the present board of directors, and at a time, as we have seen, when only two of the five members of the present board were in office, except the following, if when properly analyzed it can be called a grievance, viz.: That the company is insolvent and unable to·carry on its business, and that it became, and, for at least two years last past, has been the duty of its directors, trustees and managers to wind up its affairs and prevent further loss; but they have failed to take any steps looking to a winding up thereof, as a part of the wrongful, unlawful and fraudulent scheme and conspiracy to prevent their misdeeds coming to light and to prevent their being called to justice and account for the same, and to enable the property of the company to be slaughtered and purchased by themselves, or their interest, to the exclusion of the stockholders.

[Bridgeport Development Co. v. Tritsch.]

In the first place, we are aware of no authority upon the part of the directors, to dissolve the corporation and wind up (by which we understand, to put an end to) its affairs. The statute provides by whom and by what procedure that may be done.—Code, §§ 1683 *et seq*. The directors and officers have no such authority. In the next place, if it can be said there are any allegations, upon which a court can act, of such a wrongful, unlawful and fraudulent scheme and conspiracy on the part of either of the directors who are said to have been thus derelict in the matter of winding up the affairs, there are certainly no such allegations affecting a majority of the board. The averment made early in the bill that all the directors and officers are parties, to a greater or less extent, in the commission of the various offenses, wrongs and misconducts in the bill charged, is too vague and indefinite to carry with it any significance whatever. Thus it appears too plain for reasonable controversy, that there is no just cause shown, taking every matter averred in the bill to be true, for assuming that the board of directors, as now constituted, is not open to the just and reasonable appeals of stockholders to redress any wrongs which may have been done to the company. The complainant, therefore, had no right to intervene and bring this suit without first having made an unsuccessful appeal to the board. So, let the equities of the company, as disclosed by the bill, be what they may, when the complainant; under these circumstances, makes the suit his own, there is no equity in his bill. The chancellor erred in refusing to set aside the appointment of the receiver, and his order in that behalf is reversed, and a decree here rendered vacating the appointment and ordering the receiver to restore to the company its property in his hands, as such receiver. If an accounting by the receiver be necessary, it is referred to the chancery court to make such orders and take such proceedings as may be necessary in the premises. The cause will be remanded to the chancery court.

Reversed, rendered and remanded.

## ON APPLICATION FOR REHEARING.

HEAD, J.—In our former opinion we considered the

propriety of the appointment of a receiver upon the allegations of the bill alone, reaching the conclusion, for the reason stated, that the complainant had not shown himself entitled to a receiver. In the body of the bill, there was no reference to any election of directors of the Development Company, except that which took place at the organization of the company, and that on November 8, 1893, when the board in office at the time of the filing of the bill was elected. No other was pointed out in the brief for complainant, and respondent's counsel, in their brief, stated, as an undisputed fact, that there had been no other. There was, however, annexed to the bill, as an exhibit, a somewhat voluminous copy of all the recorded proceedings of the stockholders and directors, from the time of the organization of the company to the filing of the bill. On application for a rehearing, our attention is called to the fact, which appears by this exhibit, that there was an election of directors on November 8, 1892, when Aldhouse, Cunningham, Gunter, Olcott and Messiter were elected. Three days later, Aldhouse was elected president, Cunningham, treasurer, and Messiter, secretary. So it is, that of the board in office when the bill was filed, Aldhouse and Cunningham had been directors from the organization of the company in October, 1891, and Olcott since November 8, 1892. Johnson and Messiter became directors, for the first time, at the election on November 8, 1893.

As set forth in the former opinion, the bill makes many charges of negligence and misconduct on the part of those in control and management of the Development Company. We have examined the answers and affidavits of the respondents and others in their behalf, and find them to contain, in the main, only very general denials of any of the charges, and express admissions of the most important ones. The record establishes the fact that the Development Company was projected, promoted and organized by the officers and others managing and controlling the Bridgeport Land & Improvement Company—a body corporate already organized and owning a large body of land, at Bridgeport. That company, it seems, paid Cunningham and Henry Morgenthan 150 city lots to organize the Development Company. Olcott was president of the Improvement Company, and Aldhouse was made vice-president of the Development

Company.   At the organization of the latter, thirty-four cash subscribers to stock had been obtained, aggregating $153,000, the authorized capital being $300,000.   The remainder, except $15,000, was subsequently issued, of which $119,000 was issued to the Improvement Company, to which reference will again be made.   There is nothing due the company on any of these stock subscriptions.   According to the record, $170,000 in money was received for stock.   A few days after the organization of the Development Company, it purchased from the Improvement Company 300 lots at $250 each, aggregating $75,000, and also 900 additional lots, at the same price, aggregating $225,000, the latter payable as follows: $55,000, February 10, 1892; $55,000, May 10, 1892; $55,000, August 10, 1892, and $60,000, August 10, 1892. The first two of these instalments were paid in money, and afterwards, the remainder, viz., $115,000, was paid in stock of the Development Company, at par.   Thus it appears that the actual holdings of the Development Company were represented by the 1,200 lots so purchased and paid for, the cash paid in by the subscribers being more than covered by the amount paid, in money, for the lots.   In these lots, the substantial interest of the cash subscribers was represented by $170,000, which they paid in, in money; and the substantial interest of the Improvement Company was represented by $115,000 paid for its stock, in lots.   The Improvement Company, however, for money paid, held $4,000 of the $170,000 of stock above referred to, making its total holding of stock $119,000, against $166,000 held by the other stockholders.   The contract for the purchase of these lots was executed by said Olcott, as president of the Improvement Company, and said Aldhouse as vice-president of the Development Company. The latter company, as its charter shows, was organized to buy and sell real estate, to erect buildings, to sell or rent the same, and to have, enjoy and exercise all the powers conferred upon such corporations by Chap. II, Title I, Part 2 of the Code of Alabama.

We thus have a general view of the status of the company when it began business, and the field of administration which lay before it.   The subsequent administration, occupying the time from October, 1891, to October, 1894, is the subject matter of the complainant's

complaint. The original opinion sets forth, in detail, the grievances complained of. It may be said that, for the purposes of a proceeding of this kind, many of them have been satisfactorily explained by the respondents. We will confine our consideration to those which seem to be of controlling importance, and about which there is practically no dispute. It is not deniable that the two corporations—the Improvement Company and the Development Company—were, substantially, under a common management. In point of government they were practically one. Those in actual control of the two bodies were, peculiarly, in a position to consult self interest, and to shape the transactions of either in the way that might best subserve that interest. That relation the law deplores, and, in respect of it, lays down very strict rules to bind those occupying it. These respondents, occupying this relation, and having confessedly blended, in matters of importance, the operations of the two companies, have given us, in answer to the many charges of misconduct, very vague and imperfect information concerning their transactions, except in answer to those charges which they could not do otherwise than admit. For instance, they have given no account of how many lots they have sold, what they received for them, nor what they did with the proceeds; no account of what buildings they erected nor rents received for the same. No account of expenses paid, or for what incurred. It is admitted that (being essentially the representatives of both companies) they knowingly purchased for the Development Company from the Improvement Company, and paid therefor, about 200 lots, at $250, each, to which the selling company had no other title than the right to pay the purchase money it owed for the same, and receive a title; and these lots were suffered to be sold for the purchase money under decrees obtained against the Improvement Company by its vendors. They relied, they say, upon the warranty of the Improvement Company—a reliance so implicit that they paid that company $185,000 in cash and $115,000 in stock for the lots, without taking any steps to remove the incumbrances, or protect the company under the warranty. Those lots became lost to the Development Company.

It is again admitted that to secure money borrowed

in New York by the Improvement Company, the Development Company executed its notes for about $45,000, the culmination of which was that, in February, 1893, there was a balance due the National Park Bank of New York, of about $10,000, and to secure the same the Development Company endorsed the negotiable note of the Improvement Company for $10,000, due at three months. The Development Company was made the payee of this note, and the transaction thus given the appearance of a discount of the paper by the National Park Bank for the use of that Company. Olcott also endorsed it, and he now testifies that his endorsement was for accommodation, and secondary to that of the Development Company. As to him, he places the company in the position of a primary debtor, though it is admitted that the sole consideration was the balance due for money borrowed by, and for the use of, the Improvement Company. The Development Company was, in fact, no less an endorser for accommodation than he. It is claimed that the company, at the times it entered into these suretyships, was largely indebted to the Improvement Company, for purchase money of lots, yet it is not pretended that it received any benefit of such suretyships by way of reduction of its indebtedness, or otherwise. It, in fact, paid its indebtedness to the Improvement Company in full, leaving its liability, if liable at all, to the Park Bank still outstanding. In June, 1893, instigated by Olcott, the Park Bank sued the Improvement Company as maker and the Development Company as endorser of this note, in New York, serving the process, in the first named case, on Olcott, as vice-president, and in the second on Aldhouse, as president. Judgment by default was rendered in each case in August, 1893. Olcott was not sued on his endorsement. In July, 1894, judgment was obtained against the Development Company, in Bridgeport, Ala., in an action by the Park Bank on the said New York judgment. Execution issued thereon, and was levied upon all the lands of the Development Company, and the same were advertised to be sold on a day shortly after the filing of this bill. There is considerable testimony emanating from the complainant tending to show that this was a scheme to have the lands sold and bought in by favored parties, at a sacrifice, but the respondents fully deny

the charge. It is certain, however, that all the lands of the company were about to be sold (and would have been but for this suit) upon a judgment rendered upon an accommodation indorsement which the company had no legal capacity to make; and it is undeniable, also, that the entire proceeding was controlled, in large measure, by a purpose to protect Olcott, who, from November 9, 1892, was a director of the company. We do not decide the question now, but upon the facts stated by the respondents themselves, or some of them, it is by no means clear that the Park Bank was such a holder of the paper as that the invalidity of the company's indorsement could not have been successfully interposed in bar of the action upon it. If the allegations of the bill are true, the defense could have been made. A majority of the board of directors in office when the bill was filed, including Olcott, were directors at the time of these suits and proceedings. They were chargeable with the wrongs of involving the company in these suretyships, and were in no position to protect the company when sued, or to take any steps for redress. Indeed, their attitude in this case, is one of positive antagonism to any redress against the demands of the Park Bank. Constituting a majority of the board, as it now appears, and, of course, having the power to control its action, it would be idle for a stockholder to seek relief through them; and so involved as they are in interests adverse to the Development Company, and such their past management of its affairs, we are now of opinion that the court below properly assumed control of its assets. In less than two years after organization they suffered all the lands of the company to be sold for taxes for the year 1892, and though fourteen months had passed since the sale, there had been no redemption, and the taxes for 1893 were still unpaid. The lands were, also, all advertised for sale on a small judgment against the company, for office rent.

Upon these considerations, we are constrained to grant the application for a rehearing. Our former judgment of reversal will be set aside, and a judgment here rendered affirming the order sustaining the appointment of the receiver.

Affirmed.